

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 18, 2017

**JERRY KIRKPATRICK v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 105789     Steve Sword, Judge**

**No. E2016-00955-CCA-R3-PC**

The petitioner, Jerry Kirkpatrick, appeals the denial of his petition for post-conviction relief, which petition challenged the petitioner's Knox County Criminal Court jury conviction of theft of property valued at $1,000 or more but less than $10,000. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Jerry Kirkpatrick.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Charme P. Allen, District Attorney General; and Randall Kilby, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A Knox County Criminal Court jury convicted the petitioner of theft of property for his role in the November 25, 2008 theft of several items and an amount of cash from the U.S. Golf store in Knoxville. At trial, accomplice Daniel Bryan Phelps testified that the petitioner "participated in the burglary of U.S. Golf and that the stolen items were taken back to the [petitioner's] home on Corker Avenue and divided between Mr. Phelps, the [petitioner], and the [petitioner's] brother." *State v. Jerry Kirkpatrick*, No. E2013-01917-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Knoxville, Aug. 22, 2014). The petitioner enlisted the help of Leonard Freeman in selling some of the golf clubs he stole from U.S. Golf. Mr. Freeman sold some of the clubs to Ronald Kent Mabry, who, in turn, asked his girlfriend to sell some clubs on eBay. *See id.*, slip op. at 7. "The serial number of the club [sold on eBay] matched the serial number of one of the

clubs stolen from U.S. Golf." *Id.* Mr. Mabry purchased the clubs from Mr. Freeman at a residence on Corker Avenue where the petitioner and his brother lived, and the petitioner was at the residence during the sale. Based upon this proof, this court "conclude[d] that Mr. Phelps's testimony was sufficiently corroborated and that the evidence at trial established that the [petitioner] exercised control over the stolen golf clubs without the owner's effective consent with the intent to deprive the owner of the property." *Id.*, slip op. at 7-8. We affirmed the petitioner's conviction and the accompanying seven-year, Range II sentence.

Following the denial of his application for permission to appeal to our supreme court, the petitioner filed a timely petition for post-conviction relief, alleging that he was deprived of the effective assistance of counsel at trial and that the State failed to disclose favorable evidence. In an amended petition, the petitioner claimed that his trial counsel performed deficiently by failing to present witnesses to establish that the petitioner was home during the time of the burglary and by failing to call Mr. Freeman as a witness at trial. In a second amended petition, the petitioner alleged that trial counsel performed deficiently by failing to call witnesses to testify that they had not seen stolen golf clubs in his residence.

At the April 8, 2016 hearing on the petitioner's petition, Dixie Hawks testified that the petitioner was "the brother of [her] uncle by marriage" and that she "was placed into his custody" when she was 12 years old. She said that she was still living with the petitioner shortly before he was charged with the offenses in this case. She said that she was removed from the petitioner's custody on November 17, 2008, and did not live there during the week of Thanksgiving that year. Ms. Hawks said that Mr. Freeman "was never inside the residence and never resided there." She agreed that Mr. Freeman "was not welcome at the house." Only the petitioner's brother, Chris Kirkpatrick, lived with them. She testified that she had access to every room in the petitioner's house, that none of the rooms had a bolt-lock, and that she had never seen golf clubs at the residence. Ms. Hawks said that no one ever contacted her about testifying on the petitioner's behalf. Ms. Hawks admitted during cross-examination that she had no personal knowledge of who might have visited or resided at the petitioner's residence after she was removed from his custody.

The petitioner's brother, John Earl Kirkpatrick, testified that he visited the petitioner regularly before the offenses and that he had access to all the rooms in the petitioner's residence. Mr. Kirkpatrick said that he knew Mr. Freeman but that he had never seen Mr. Freeman at the petitioner's residence. He added that it was "kind of uncommon" for the petitioner to have visitors. He testified that no one other than the petitioner, Chris Kirkpatrick, and Ms. Hawks had lived at the residence and that no one had ever stayed there overnight. Mr. Kirkpatrick said that he did not see golf clubs at the

-2-

petitioner's residence during November or December 2008. He recalled that he visited the petitioner on Thanksgiving Day 2008 to take food to the petitioner, who had been sick with "a respiratory infection" most of the week. Mr. Kirkpatrick said that no one contacted him regarding the possibility of his testifying at the petitioner's trial.

The petitioner acknowledged that trial counsel shared the discovery materials with him, but he maintained that he was unaware until trial that the State alleged that the stolen golf clubs were in his residence and that Mr. Freeman was going to testify against him. He said that he asked counsel to call several witnesses, including his neighbors and friends, who had been in his house during that time period and who knew that he had been ill at that time. He said that he was hospitalized on December 16, 2008, for treatment of a lung infection that he had had for several weeks. He recalled that he was seriously ill at the time and that he could not work or drive.

The petitioner testified that he specifically asked trial counsel to call Ms. Hawks as a witness because he had been granted temporary custody of her by the State. He added that representatives from "Youth Villages" and the Department of Children's Services ("DCS") visited his house weekly when Ms. Hawks lived there. In addition, he said, Ms. Hawks had "knowledge of everything that was in the residence. . . . She had knowledge of the people who come over." He also asked trial counsel to call Mr. Kirkpatrick because Mr. Kirkpatrick had visited the petitioner on Thanksgiving and could have testified about his illness.

The petitioner said that trial counsel was "a good lawyer" and that he had "done a really great job" but that he should have tried to contact Ms. Hawks and Mr. Kirkpatrick. He said that he told counsel that he had never seen Mr. Mabry until the preliminary hearing and that neither Mr. Mabry nor Mr. Freeman had ever been to his residence.

During cross-examination, the petitioner said that Mr. Freeman had previously sold crack cocaine to Chris Kirkpatrick. He said that he knew Mr. Phelps because Ms. Hawks babysat for Mr. Phelps and his girlfriend, Heather Moore. He recalled that he had offered Mr. Phelps a job just before he became ill and unable to work.

The petitioner testified that he met with trial counsel approximately 11 times between June 2011 and his October 2012 trial. During that time, he provided counsel with the names of "[a]t least 30" potential witnesses. He said that counsel did not tell him why he did not want to call the potential witnesses. He added that he did not even know what counsel's strategy was for this trial.

Trial counsel testified that he was appointed to represent the petitioner "on about four or five cases all at once, but two of them went to trial." He recalled that he and the petitioner spent a significant amount of time discussing the potential testimony of Messrs. Freeman, Phelps, and Mabry as well as Ms. Gonzalez. He said that the petitioner "was very involved" in discussing trial strategy and that the petitioner "had done a fair amount of research on his own" before meeting with trial counsel. He recalled that the petitioner did tell him about "some of the witnesses beforehand," but he said that he could only recall Ms. Hawks and a man named Gilbert Taylor. He said that he told the petitioner that it was not possible to mount an alibi defense because no one was at the petitioner's house at the time of the offenses. He stated that, because Ms. Hawks was removed from the petitioner's custody prior to the offenses, "the period of time that she could talk about would not be the period of time that the allegations occurred in." As a result, "her relevance would have been very low."

Trial counsel testified that he explained to the petitioner that "presenting the argument that none of these people had ever been" to the petitioner's house or that "none of these people were staying there was not a strong argument" given that Mr. Mabry was able to take an investigator directly to the petitioner's house and identify it as the location where he purchased the stolen golf clubs. Mr. Mabry indicated that he thought that "Mr. Freeman was living at the house, and that part of the house was secured by a bolt lock such that Mr. Kirkpatrick couldn't get into it." Counsel said that he thought the better trial strategy was to make an "argument that this is Mr. Freeman's room; that Mr. Freeman is the bad guy; that these are Mr. Freeman's clubs, these aren't [the petitioner's] clubs." He said that he "tried to articulate to the jury" that the petitioner "didn't take part in the transaction; and that the clubs were in a room that [Mr. Mabry] believed that Mr. Freeman could secure" from the petitioner. Because that was his strategy, he "certainly wasn't going to put on witnesses to try to say that there wasn't a bolt on that door or that Mr. Freeman didn't have access to the house."

Counsel testified that the petitioner initially attempted to "fire" him on the day of his trial on an unrelated charge. Their relationship became smoother after the petitioner was acquitted of burglary in that case. Counsel said that he believed the petitioner to be in agreement with the strategy in this case. He recalled that the petitioner maintained his innocence, "[b]ut with him unable to take the stand, we had to craft a defense based on the facts that were going to come out." He stated that he initially believed he might present an alibi defense but that his investigation made it "clear that that was not going to be the case." Counsel said that he also wanted to avoid presenting any evidence that might have opened the door to the petitioner's other burglary and theft charges, so he did not want to bring in witnesses to testify about the petitioner's good character. Although he could not recall having a specific conversation with the petitioner

-4-

about the witnesses, counsel said that he was "a fairly blunt person," so he would have told the petitioner which witnesses were "useful or not useful."

Counsel said that the petitioner knew prior to trial what Mr. Mabry's testimony would be because they had discussed it beforehand and how it was helpful to their strategy.

During cross-examination, counsel acknowledged that Mr. Freeman did not testify at the petitioner's trial. He said that he was aware that Mr. Mabry had told police that Mr. Freeman took him to the petitioner's house and that he saw golf clubs from a locked room in the petitioner's house. Mr. Mabry did not get golf clubs on that day; Mr. Freeman brought them to him on a different day. Counsel acknowledged that because the petitioner owned the house, the jury was free to infer that he could access any room inside of it. Counsel agreed that, without proof that the petitioner had totally surrendered control of the room to Mr. Freeman, the jury could have concluded that the petitioner constructively possessed the golf clubs that were stored inside his residence. He said that was why he wanted to use Mr. Mabry's testimony to emphasize that there was a lock on the room that prevented the petitioner from accessing it. He said it "would have been great" if he could have shown that Mr. Mabry had the wrong house but that "nothing [he had] been given that made that look like that was even a remote possibility." He agreed that it would have been a good defense if he could have shown that Mr. Mabry had incorrectly identified the residence, but "it wouldn't be a good defense" if counsel "could not prove it." Counsel said it was also possible that Mr. Mabry had lied about going to the defendant's residence, but he had no proof to make such a claim.

Trial counsel said that neither he nor his investigator contacted Ms. Hawks because the petitioner told counsel that Ms. Hawks had been removed from his custody prior to Thanksgiving. He said that after learning that she had not been living in the house during the relevant time frame, he determined "that she was a greater liability than she was a benefit." He added that he did not want to risk the jury's learning that Ms. Hawks had been "removed from his custody by DCS."

Counsel said that he did not attempt to contact John Kirkpatrick to testify at the trial in this case because, after the petitioner's acquittal in the first of his trials, "we knew what our strategy was" and that strategy did not require Mr. Kirkpatrick's testimony. He said that he did not interview Mr. Freeman because "Mr. Freeman was the guy we were going to pile it on." He said that an "investigative summary" he was provided in the discovery materials indicated that Mr. Freeman had referred to the petitioner and Chris Kirkpatrick "by name as the people who were doing this." Counsel explained, "Mr. Freeman had nothing but bad news for us. We didn't want him here to defend himself."

At the conclusion of the hearing, the post-conviction court denied relief, finding that counsel's trial strategy was "grounded in reason" and that "it was an intelligent move" given the facts available to trial counsel. The court noted that "[t]he fact that it was an unsuccessful strategy does not" prove that counsel performed deficiently. The court observed that counsel's cross-examination of Mr. Phelps was successful and that the jury acquitted the petitioner of burglary. Counsel stated that Ms. Hawks's testimony "would not have helped at all in this . . . because she wasn't there." The court accredited counsel's testimony that he conferred with the petitioner about the trial strategy and that the petitioner "probably was" on board with the strategy. The court stated that, "even now, looking back at it," the strategy developed by counsel "was probably the best strategy." The court stated that none of the testimony presented at the hearing caused the court to believe "that the outcome would have been any different" had the witnesses been called. As a result, the court determined that trial counsel did not perform deficiently.

In this timely appeal, the petitioner contends that the post-conviction court erred by denying his petition for post-conviction relief, reiterating his claim that trial counsel was ineffective for failing to present Ms. Hawks and Mr. Kirkpatrick as witnesses at trial. The State asserts that the post-conviction court properly denied relief.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Kendrick*, 454 S.W.3d at 457; *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record fully supports the denial of relief in this case. The post-conviction court accredited counsel's testimony that, based upon his investigation, he determined the best strategy for trial was to emphasize that Mr. Freeman was in control of the stolen items rather than the petitioner. The court also concluded that, based upon its recollection of the trial, counsel's strategy "was probably the best strategy." The testimony offered at the evidentiary hearing by Ms. Hawks and Mr. Kirkpatrick did not support that strategy and would not, therefore, have been helpful to the petitioner's case at trial. Importantly, this court will not second-guess a reasonably-based trial strategy or sound, but unsuccessful, tactical decisions. *Adkins*, 911 S.W.2d at 34.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE